IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MARCHELLO ALSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17CV500 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Marchello Alston ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed his application for Supplemental Security Income on October 30, 2014, alleging a disability onset date of November 15, 2012. (Tr. at 15, 193-98.)[1] Through his attorney, he later amended his alleged onset date to his application date. (Tr. at 15, 37.) Plaintiff's application was denied initially (Tr. at 96-112) and upon reconsideration (Tr. at 113-30). Thereafter, he requested an administrative hearing de novo before an

---
[1] Transcript citations refer to the Sealed Administrative Record [Doc. #8].

Administrative Law Judge ("ALJ") (Tr. at 151-53), which he attended on September 14, 2016, along with his attorney and an impartial vocational expert (Tr. at 15). The ALJ ultimately issued a decision finding Plaintiff not disabled within the meaning of the Act (Tr. at 29), and, on April 3, 2017, the Appeals Council denied review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his application date. Plaintiff therefore met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> post-traumatic stress disorder (PTSD); generalized anxiety disorder; panic disorder; depressive disorder; psychotic disorder/schizoaffective disorder; bipolar disorder; personality disorder; borderline intellectual functioning; history of substance abuse; mitral valve stenosis, status-post replacement; chronic obstructive pulmonary disease (COPD); atrial fibrillation (A-Fib); hypertension; [and] rotator cuff disease.

(Tr. at 17.) The ALJ found at step three that none of these impairments, singly or in combination, met or equaled a disability listing. (Tr. at 17-22.) Therefore, the ALJ assessed Plaintiff's RFC and determined that he retained the RFC for sedentary work with the following additional limitations:

5

he must avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dusts, gases, poor ventilation and the like, and also avoid concentrated exposure to workplace hazards, such as dangerous moving machinery and unprotected heights. He is generally able to understand and perform simple, routine, repetitive tasks; he can maintain concentration, persistence, and pace to stay on task for periods of 2 hours at a time over the span of [a] typical 8-hour workday, in jobs with a reasoning level 1 or 2 as a maximum. He requires a low stress work setting, which is further defined to mean no production-pace or quota-based work[;] rather[,] he requires a goal-oriented job that primarily deals with things rather than people, with no more than occasional changes in the work setting. Social interaction is limited to occasional with supervisors and co-workers, but he would not be required to work with the public as part of the job, such as sales or negotiation, which does not preclude incidental or casual contact as it might arise.

(Tr. at 22.) At step four, the ALJ determined that Plaintiff had no past relevant work. (Tr. at 28.) However, he concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled. (Tr. at 28-29.)

Plaintiff now argues that the ALJ erred in two respects. First, he contends that, at step three, the ALJ failed to properly consider the applicability of 20 C.F.R., Part 404, Subpt. P, Appx. 1, § 12.05C (hereinafter "Listing 12.05C"). Second, he contends that the ALJ failed to properly consider the opinions of the consultative psychological examiners. As discussed below, the Court agrees that both of these issues merit remand.

    A.    Listing 12.05C

As set out above, at step three of the sequential analysis the ALJ considers whether any impairment meets or equals one or more of the impairments listed in the regulations at 20 CFR Part 404, Subpart P, Appendix 1. In analyzing the evidence at step three, an ALJ is not required to explicitly identify and discuss every possible listing; however, he must provide

sufficient explanation and analysis to allow meaningful judicial review of his step three determination, particularly where the "medical record includes a fair amount of evidence" that a claimant's impairment meets a disability listing. Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013). Where such evidence exists but is rejected without discussion, "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." Id. (citing Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986)). In reviewing the ALJ's analysis, it is possible that even "[a] cursory explanation" at step three may prove "satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." Meador v. Colvin, No. 7:13-CV-214, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) (citing Smith v. Astrue, 457 F. App'x 326, 328 (4th Cir.2011)). Nevertheless, the ALJ's decision must include "a sufficient discussion of the evidence and explanation of its reasoning such that meaningful judicial review is possible." Id. If the decision does not include sufficient explanation and analysis to allow meaningful judicial review of the ALJ's listing determination, remand is appropriate. Radford, 734 F.3d at 295.

In the present case, at step three of the sequential analysis, the ALJ found that "[t]he severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.03, 12.04, 12.06 and 12.09." (Tr. at 21.)[4] In making this finding, the ALJ examined whether Plaintiff's mental impairments met the "paragraph B" criteria of the listings, and determined that Plaintiff had moderate

---

[4] The ALJ also specifically considered whether Plaintiff's physical impairments met the listings for chronic respiratory disorders, chronic heart failure, recurrent arrhythmias, or ishemic heart disease. (Tr. at 18-21.) Plaintiff does not challenge this analysis.

7

restrictions in activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. at 21.) He also examined whether Plaintiff's chronic organic mental disorder, schizoaffective disorder, psychotic disorder, panic disorder, depressive disorder, and/or anxiety disorder met the "paragraph C" criteria of listings 12.02, 12.03, 12.04, or 12.06. (Tr. at 22.) However, the ALJ did not address the applicability of Listing 12.05 to the facts of Plaintiff's case.

Listing 12.00 covers mental disorders generally, and Listing 12.05 covers Intellectual Disability. Under Listing 12.05,

> [i]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05. In addition, the required level of severity for this disorder is met if the requirements of parts A, B, C or D are also satisfied. Specifically, Listing 12.05C requires:

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05C.[5] In other words, a claimant must demonstrate three elements to meet Listing 12.05C: (1) deficits in adaptive functioning manifested before age 22, (2) a valid IQ score between 60 and 70, and (3) another impairment

---

[5] The listings have been amended, effective January 17, 2017. See 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05; 81 Fed. Reg. 66161, 66167 (Sept. 26, 2016); see generally 81 Fed. Reg. 66138-01 (Sept. 26, 2016). The Court has reviewed the ALJ's decision based on the version of Listing 12.05 in effect at the time of the ALJ's decision. Therefore, all references herein are to the version of Listing 12.05 and related regulations in effect at the time of the ALJ's decision.

imposing an additional and significant work-related limitation of function. See Luckey v. U.S. Dept. of Health & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989). In this case, the ALJ did not address Listing 12.05C, and the question is whether there is sufficient evidence in the record to trigger the potential applicability of Listing 12.05C, and if so, whether the ALJ's explanation and analysis, as a whole, is nevertheless sufficient to allow judicial review of the step three determination as to that Listing.

With respect to Listing 12.05C's requirement that Plaintiff have a valid verbal, performance, or full scale IQ score between 60 and 70, Plaintiff was found to have a verbal comprehension index score of 68 and a full scale IQ of 73, based on testing as part of a July 7, 2015 consultative examination. (Tr. at 1445.) Defendant now argues that, unlike previous versions of the Wechsler Adult Intelligence Scale ("WAIS"), the WAIS-IV administered to Plaintiff in 2015 yields only a full scale IQ score. Therefore, she contends that the ALJ was not required to consider Plaintiff's four underlying index scores, including his verbal comprehension index score of 68. (Def.'s Br. [Doc. #14] at 9.) However, the listings clearly mandate that, "[i]n cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the *lowest* of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00D.6.c (emphasis added); see also Leftwich v. Colvin, 1:13CV414, 2016 WL 126753 (M.D.N.C. Jan. 11, 2016.) The WAIS-IV has been in use since 2008, and subsequent case law, as well as explanations provided in the Frequently Asked Questions portion of the test itself, clearly indicate that the terms "verbal IQ" and "verbal comprehension index score" are functionally equivalent for purposes of the Listings. Johnson v. Berryhill, No. 6:16-2669-

RMG-KFM, 2017 WL 1653248, at *6 (D.S.C. Apr. 13, 2017) (citing Troxel v. Colvin, C.A. No. C13-0057, 2014 WL 1323637, at *8 n.3 (N.D. Iowa, Apr. 1, 2014) (citation omitted) ("The terms 'Verbal IQ' and 'Performance IQ' from the WAIS–III were replaced with 'Verbal Comprehension' and 'Perceptual Reasoning' in the WAIS–IV. Verbal Comprehension and Perceptual Reasoning should be substituted for Verbal IQ and Performance IQ, respectively.")); Martin v. Comm'r, Soc. Sec. Admin., C.A. No. SAG-12-1130, 2013 WL 4512071, at *2 (D. Md. Aug. 22, 2013) ("Because the various tests have been modified since the Listings were created, the 'verbal comprehension index score' is the equivalent of 'verbal IQ,' and the 'perceptional reasoning index score' is the equivalent of 'performance IQ.' ") (citation omitted); see also Fatheree v. Colvin, No. 1:13-cv-01577-SKO, 2015 WL 1201669, at *9-10 (E.D. Ca. Mar. 16, 2015) (detailing the rationale for "considering or recognizing that the Verbal Comprehension Index score used in the WAIS-IV test is the functional equivalent of the Verbal IQ score that was used in the WAIS-III)).[6]

The ALJ's decision in this case omitted any reference to the verbal IQ score of 68, and instead referenced only Plaintiff's full-scale IQ score of 73. (Tr. at 25.) In reporting the score, the consultative examiner specifically noted that Plaintiff's "Verbal Comprehension Score falls

---

[6] In support of the contention that the "WAIS-IV testing that [Plaintiff] underwent yields only 'Full Scale' IQ scores" (Def. Br. at 9), Defendant cites a website from the Texas Statewide Leadership for Autism Training, which includes a general description of the WAIS-IV test. That summary notes that "[t]he WAIS-IV yields Full Scale IQ, Index Sores, and subtest-level scaled scores. The four Index Scores are Verbal Comprehension (VC), Perceptual Reasoning (PR), Working Memory (WM), and Processing Speed (PS)." A chart further notes that the WAIS-IV yields four composite scores, including verbal comprehension, as well as a full scale IQ. It is not clear how this summary supports the contention that the WAIS-IV testing that Plaintiff underwent did not include a verbal IQ score for purposes of Listing 12.05. The report of Plaintiff's testing from the Consultative Examiner clearly reflects that Plaintiff was tested with the WAIS-IV providing "composite scores that represent intellectual functioning in specific cognitive domains (ie. Verbal Comprehension Index, Perceptual Reasoning Index, Working Memory Index and Processing Speed Index)." (Tr. at 1444.) Plaintiff's composite score in each of those areas is included in the report. (Tr. at 1445.)

within the low range of functioning" while the others were borderline or low average. (Tr. at 1445.) The Consultative Examiner concluded that Plaintiff's verbal skills were "consistent with mild intellectual deficiency." (Tr. at 1448.) The ALJ did not did not mention Plaintiff's verbal IQ score of 68 at all, let alone make a determination that the score was unreliable, invalid, or should not be considered. Thus, there is evidence in the record of a verbal IQ score of 60 through 70.

With respect to Listing 12.05C's requirement that the claimant suffer from another impairment "imposing an additional and significant work-related limitation of function," the Listing provides that "the degree of functional limitation the additional impairment(s) imposes" will be analyzed to "determine if it significantly limits [the] physical or mental ability to do basic work activities, i.e., is a 'severe' impairment(s), as defined in §§ 404.1520(c) and 416.920(c)." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00A. Thus, "[i]f the additional impairment(s) does not cause limitations that are 'severe' as defined in §§ 404.1520(c) and 416.920(c)," the additional impairment would not constitute "an additional and significant work-related limitation of function." Id. Here, the ALJ in the present case found that Plaintiff suffered from numerous severe impairments at step two of the sequential analysis (see Tr. at 17), including PTSD, anxiety disorder, panic disorder, depressive disorder, psychotic disorder/schizoaffective disorder, bipolar disorder, personality disorder, borderline intellectual functioning, history of substance abuse, mitral valve stenosis, COPD, A-Fib, hypertension, and rotator cuff disease. Accordingly, there is evidence in the record that Plaintiff had "an additional and significant work-related limitation of function."

11

Finally, with respect to Listing 12.05C's requirement of "deficits in adaptive functioning initially manifested" before age 22, the regulations in effect at the time of the ALJ's decision did not "expressly define 'deficits in adaptive functioning' or specify the degree of deficit required (mild versus significant, for example), whether deficits must exist in one, two, or more categories of adaptive functioning, or what methodology should be used to measure deficits in adaptive functioning." Blancas v. Astrue, 690 F. Supp. 2d 464, 476-477 (W.D. Texas 2010. Generally speaking, adaptive functioning analysis "entails a fact-intensive inquiry concerning the ability of the claimant to cope with common life demands and achieve certain standards of personal independence." Salmons v. Astrue, No. 5:10CV195, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012). "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Jackson v. Astrue, 467 F. App'x 214, 218 (4th Cir. 2012) (citing Atkins v. Virginia, 536 U.S. 304, 309, n.3 (2002)). In addition, poor school performance generally provides the best, and in many cases the only, direct evidence of adaptive functioning deficits before age 22. See e.g., Turner v. Bowen, 856 F.2d 695, 699 (4th Cir. 1988) ("The most important evidence . . . bearing on the application of § 12.05 is the testimonial and documentary evidence throughout the record establishing that [claimant] was unable to read or write at age sixteen even after ten grades of schooling—a clear 'manifestation' of mental retardation occurring before age twenty-two.").

In this case, the ALJ never explicitly considered whether Plaintiff suffered from deficits in adaptive functioning. Moreover, in considering other potentially-applicable listings, the ALJ

found Plaintiff moderately limited in activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (Tr. at 21.) These findings suggest adaptive deficits which the ALJ has not addressed in the context of applying Listing 12.05C. See Rothrock v. Colvin, No. 1:13CV497, 2016 WL 1175189, at *7 (M.D.N.C. Mar. 23, 2016); Adams v. Colvin, 2016 WL 6238559 (M.D.N.C. Oct. 25, 2015); accord Harris v. Colvin, No. 2:13CV28109, 2015 WL 268246, at *16 (S.D.W. Va. Jan. 20, 2015) ("[T]he ALJ's written decision cannot withstand scrutiny. Her findings of moderate limitations in two categories of adaptive functioning [i.e., social functioning and concentration, persistence, or pace], by themselves, tend to negate her unsupported statement that 'the deficits in adaptive functioning needed to establish mental retardation are simply not present.'")). Notably, the record further reflects that Plaintiff has never had a valid driver's license, cannot take the bus by himself, does not perform household chores or shop on his own, and needs reminders to take his medications. (Tr. at 75, 121, 1376, 1443.) In addition, the Consultative Examiner who administered the IQ test noted that Plaintiff "clearly evidenced" significant deficits in adaptive functioning, based on his "difficulties in communication skills, daily living skills, independent living skills and socialization" as well as his "poor insight into his problems" and "history of behavior showing poor judgment." (Tr. at 1449.)

The ALJ also failed to consider and address evidence as to Plaintiff's adaptive functioning prior to age 22. Although the evidence before the ALJ included Plaintiff's school records, the ALJ neglected to mention these reports, which confirmed that Plaintiff struggled academically, consistently earned low grades and test scores, was placed in special education classes in his early teens, and ultimately dropped out of school in tenth grade. (Tr. at 297-

301.) Plaintiff related these difficulties to the consultative examiners, reporting that he failed the ninth grade (Tr. at 1375) and had "problems in all academic areas but specifically difficulties in reading and spelling" (Tr. at 1442).[7]

In short, the record clearly "includes a fair amount of evidence" that Plaintiff had limitations in adaptive functioning, including functional academic skills, which manifested before age 22. Radford, 734 F.3d at 295. That is not to say that the application of Listing 12.05C is without question here, but there is at least conflicting evidence, and "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." Id. (citing Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986)). The ALJ's failure to address Listing 12.05C is thus more than a "technical error," and is instead a situation where "the ALJ's failure to adequately explain his reasoning precludes this Court . . . from undertaking a 'meaningful review.'" Radford, 734 F.3d at 296. Therefore, the appropriate course is to remand the case to the ALJ for further proceedings.[8]

---

[7] In the briefing, Defendant notes that Plaintiff's school records reflect an IQ of 85 in the third grade. (Tr. at 298.) However, in testing that same year, the records reflect that Plaintiff's reading and writing skills were at the second and third grade level while Plaintiff was in the third grade, but Plaintiff's reading and writing skills stayed at that second and third grade level years later, when Plaintiff was tested in the sixth grade and even when Plaintiff was tested as an adult. (Tr. at 298, 1446-47.) As noted above, the records also reflect that he was referred to special education classes in later elementary and middle school. (Tr. at 300.) Thus, the IQ score from third grade does not definitely address the issue of Plaintiff's deficits in adaptive functioning prior to age 22. Moreover, and in any event, this is an analysis to be undertaken by the ALJ, and the ALJ did not address this issue at all. Defendant may not attempt to rely on *post hoc* reasoning that was not included by the ALJ.

[8] The Court also notes that Plaintiff previously filed a claim that was the subject of a prior administrative decision, and that decision specifically addressed the issue of whether Plaintiff met the requirements of Listing 12.05C. With respect to Plaintiff's IQ score, the ALJ in the prior case considered – and ultimately rejected – a verbal IQ score of 68 obtained during testing in January 2013. (Tr. at 77, 82.) Because Plaintiff's present listing claim stems from additional testing in 2015, which post-dates the prior decision, with different opinions from the consultative examiner who administered the test, the rationale utilized in the prior decision would not resolve the matter at hand. Moreover, the ALJ in this case did not indicate any intent to rely on that prior analysis with regard to Listing 12.05C, and the Court cannot make that assumption or attempt to analyze that prior determination in light of the current evidence in the record in the first instance.

B.      Consultative Opinion Evidence

Plaintiff next challenges the ALJ's treatment of the consultative opinions issued by two psychological examiners: Dr. Steven Levitt, a psychiatrist, and Mr. David Schrum, a psychological associate. The ALJ described Dr. Levitt's finding as follows:

> On January 7, 2015, Dr. Levitt opined [Plaintiff] would not be able to retain and follow instructions in a consistent manner over significant periods of time. His attention and concentration would be just [sic] well below normal. He would not be able to perform repetitive tasks with consistency over significant periods of time. He might have difficulty relating to people around him in a work setting in general and would not be able to tolerate the stress and pressure[s] associated with usual day-to-day work activity on any regular basis.

(Tr. at 26.) The ALJ then described the findings in Mr. Schrum's similar opinion:

> On July 7, 2015, Mr. Schrum opined [Plaintiff] would do better in jobs that are more repetitive in nature, particularly after his work responsibilities are understood and mastered. He may need frequent reminders even after learning new skills. Close supervision was also recommended particularly during the initial stages of employment. . . . He also concluded that [Plaintiff] might be better suited for supportive employment or use of a job coach.

(Id.) Although the ALJ acknowledged that Mr. Schrum's opinion was "somewhat consistent with [Plaintiff's] symptoms and other evidence in the record," the ALJ ultimately assigned Mr. Schrum's opinion "partial weight," noting that (1) a licensed psychological associate is not an acceptable medical source under the Act, and that (2) "the record also indicates that [Plaintiff's] symptoms are well controlled when his [sic] compliant with medications." (Id.) The ALJ also accorded "little weight" to Dr. Levitt's opinion, again stating "the record indicates that [Plaintiff's] symptoms are well controlled when his [sic] compliant with medications." (Id.) Significantly, this was the *sole* reason the ALJ disclosed for discounting Dr. Levitt's opinion in the course of his RFC analysis. However, at step three of the sequential analysis, the ALJ further explained that this assignment of weight was "based on the fact that it was based on a

15

one-time exam, and the longitudinal record, as discussed below, fails to support the degree of limitation estimate[] by Dr. Levitt." (Tr. at 21.) At this step, the ALJ also reiterated that, while Mr. Schrum's opinion "was arguably supportive of Dr. Levitt's findings," . . . "the evidence shows [Plaintiff] is stable psychiatrically with medication and treatment." (Id.)

However, despite the ALJ's repeated assertions that Plaintiff's psychiatric condition is well-controlled during periods of treatment compliance, the record contains little evidence to support this claim,[9] and the decision itself contains none at all. Notably, the consultative examinations by Mr. Schrum and Dr. Levitt both indicated that Plaintiff was taking his medications at the time of the examinations, yet each examiner still reached the conclusions noted above, that Plaintiff would not be able to retain and follow instructions in a consistent manner, he would not be able to perform repetitive tasks with consistency, he might have difficulty relating to people around him in a work setting, he would not be able to tolerate the stress and pressure associated with usual day-to-day work activity on any regular basis, and he would be better suited for supportive employment or use of a job coach. (Tr. at 1376, 1378, 1442, 1449, 1450.) In addition, Plaintiff's mental health treatment records reflect that during treatment in July and August 2014, his condition was "worsening" (Tr. at 963, 967), and during treatment in February to April 2015, records reflect difficulty finding an effective medication and that Plaintiff showed "inadequate treatment response." (Tr. at 1639, 1652, 1654, 1655.)

---

[9] At the hearing, the ALJ asked Plaintiff whether there has "ever been any period in your life where you've been consistently treated for mental health and on medication and a period of stability for you?" (Tr. at 51.) Plaintiff responded that when he stayed on his prescribed medications, he slept all the time and felt like a zombie. (Tr. at 52.) During his evaluation with Mr. Schrum, Plaintiff also indicated that his medication helps reduce the severity and frequency of his auditory and visual hallucinations. (Tr. at 1443, 1449.) However, this record does not relate the extent to which Plaintiff's hallucinations were controlled, or in any way address the success of medications in managing Plaintiff's myriad other mental symptoms.

16

As noted by the ALJ, during those counseling sessions, Plaintiff "exhibited attentional and hyperactive behaviors, difficulty sustaining attention, poor listening skills, inattentiveness, and a need for redirection." (Tr. at 25.)

Defendant now cites instances in which Plaintiff's behavior, thought content, and affect were noted as normal. (Def.'s Br. at 11) (citing Tr. at 1659, 1668, 1698, 1737, 1870, 1979, 2011, 2017, 2021, 2033).[10] However, none of these findings stem from mental health treatment notes. Rather, they appear as single-line notations regarding Plaintiff's demeanor during physical examinations. See also Testamark v. Berryhill, No. 17-2413, __ F. App'x __ (4th Cir. August 31, 2018) (finding that "the record provides reason to question the ALJ's basis" for discounting opinion evidence, where "the ALJ relied heavily on observations picked from check-the-box forms in Testamark's treatment notes . . . [but] [t]he ALJ did not explain the significance of these observations or why they were inconsistent with the functional limitations assessed by Testamark's treating sources," and further noting that "[b]ecause symptoms of mental illness may wax and wane over the course of treatment, the fact that Testamark exhibited fair judgment or appeared cooperative on certain specific occasions is not inconsistent with the conclusion that she is unable to work."). Moreover, nothing in the record ties these findings to Plaintiff's medication compliance, and the ALJ did not cite to these records or provide any analysis to support such a conclusion.

In addition, the Court notes that in reviewing the evidence in the record, the ALJ did set out one treatment note from June 2015, in which Plaintiff's "speech was normal, his

---

[10] Defendant also selects only portions of these records. For example, many of the records cited by Defendant are from a community health center, but Plaintiff's initial evaluation there reflects that he was "disorganized," possibly with "limited capacity . . . as manifested in speech pattern." (Tr. at 2005.)

17

thought content was normal, his mood was anxious, he was agitated, he expressed appropriate judgment, and he exhibited abnormal remote memory." (Tr. at 25, 1436-37, 1979.) However, it is not clear how a record reflecting that Plaintiff was anxious and agitated, with abnormal remote memory, is inconsistent with the evaluations by Mr. Schrum and Dr. Levitt.

Ultimately, the ALJ discounted the opinions of both consultative examiners based on the assertion that Plaintiff's mental "symptoms are well controlled when [he is] compliant with medications," but that assertion is without analysis or explanation and appears unsupported by the record. Accordingly, substantial evidence fails to support the ALJ's treatment of the consultative examiners' opinions, and this failure provides an additional basis for remand.[11]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for further consideration of Plaintiff's claims in light of the above recommendation. Defendant's Motion for Judgment on the Pleadings [Doc. #13] should be DENIED, and Plaintiff's Motion for Judgment Reversing the Commissioner [Doc. #11] should be GRANTED to the extent set out herein. However, to the extent that Plaintiff's motion seeks an immediate award of benefits, it should be DENIED.

This, the 4th day of September, 2018.

                                                  /s/ Joi Elizabeth Peake
                                                  United States Magistrate Judge

---

[11] The Court also notes that in the briefing, Defendant makes multiple references to Plaintiff's substance abuse history. That can certainly be considered by the ALJ within the context of the applicable regulatory framework. However, the ALJ did not rely on Plaintiff's substance abuse history, and the Court will not undertake such an analysis in the first instance.